**UNIROYAL, INC., Plaintiff**

v.

**HOFF AND THAMES, INC., d/b/a Case Tire and Supply Company, Robert E. Thames, and A. L. Hoff, Defendants.**

**Civ. A. No. J77–0314(N).**

United States District Court, S. D. Mississippi, Jackson Division.

March 2, 1981.

Lawrence J. Franck, Richard L. Forman and Alan W. Perry, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, Miss., for plaintiff.

Pat H. Scanlon, E. Stephen Williams, Young, Scanlon & Sessums, Jackson, Miss., for defendants.

## MEMORANDUM OPINION

NIXON, District Judge.

This action was filed by Uniroyal, Inc. ("Uniroyal") against the defendant Hoff and Thames, Inc., d/b/a Case Tire and Supply Company ("Case"), Robert E. Thames ("Thames") and A.L. Hoff ("Hoff"). Uniroyal's Complaint, founded on diversity jurisdiction, alleges that Case is indebted to Uniroyal as the result of credit extended by Uniroyal to Case in connection with Case's purchase of tires from Uniroyal. The Complaint further alleges that Thames and Hoff are individually liable for the indebtedness of Case, as the result of individual guarantees executed by them.

Case answered the Uniroyal Complaint, and filed a counterclaim against Uniroyal and Otasco, Inc. ("Otasco"), alleging that Uniroyal had granted Otasco favorable prices which discriminated against Case, in violation of the Robinson-Patman Act, 15 U.S.C. § 13 et seq.

Case subsequently dismissed its claim against Otasco without prejudice and amended its counterclaim against Uniroyal, Inc. The Amended Counterclaim asserted by Case states the following:

1. That Uniroyal violated the Robinson-Patman Act

(a) by transferring tires to its company-owned stores at a price less than the price at which Case purchased;

(b) by selling tires to other dealers in Mississippi at a lower price than the price at which Case purchased; and

(c) by selling tires to Otasco at a lower price than the price at which Case purchased.

2. That Uniroyal entered into a contract agreement or a combination with Otasco in restraint of trade or commerce, in violation of the Sherman Act (15 U.S.C. §§ 1–7).

3. That Uniroyal's selling arrangement with Otasco violated Mississippi Code of 1972, Section 75–21–1 et seq..

4. That Uniroyal breached a contract with Case granting Case an exclusive sales

territory by allowing Otasco to purchase tires from Uniroyal and resale them at Otasco's Brookhaven store.

This case is now before the Court on a Motion for Summary Judgment filed by Uniroyal as to the counterclaims asserted by Case and on Motion for Summary Judgment filed by Case with respect to cost justification studies prepared by Uniroyal in support of the functional discount granted by Uniroyal to Otasco. Extensive discovery has been undertaken which includes numerous depositions, extensive interrogatories, and the production of voluminous documents and the Court now finds this matter ripe for decision.

Uniroyal is a corporation organized and existing under the laws of the State of New Jersey and is engaged in numerous business activities, including that involved in this litigation, the manufacture and sale of tires. Uniroyal sells its tires to various outlets, including its company-owned stores and independent dealers.

The defendant Hoff & Thames, Inc. ("Case") is a corporation organized and existing under the laws of the State of Mississippi. It was organized for the purpose of acquiring an existing retail tire business known as Case Tire & Supply, and has continued to do business in Brookhaven using that trade name.

The defendants, Robert E. Thames ("Thames") and A.L. Hoff ("Hoff"), adult resident citizens of Mississippi, are the owners of all the outstanding capital stock of Case. Furthermore, they are its corporate officers in addition to being directly involved in the conduct of its business. Hoff and Thames each executed a written guarantee with respect to Case's indebtedness to Uniroyal.

## FINDINGS OF FACT

### a. Uniroyal's Dealings with Case

For several years prior to 1973, Case was engaged in the business of retail tire sales as a tire dealer in Brookhaven, Mississippi, handling various brands of tires. Prior to 1973, Case occasionally purchased Uniroyal tires from Uniroyal but had no dealership arrangement with Uniroyal.

In 1973, Case and Uniroyal entered into a Zeta Charter Agreement (Exhibit "I", Thames Dep.), under the provisions of which Uniroyal agreed that it would not deliver Zeta tires to any other retail or wholesale establishment in the charter area, Lincoln County, Mississippi. The charter area was designated as Case's area of primary responsibility, and Case agreed to use its best efforts to distribute Zeta tires within that area. The agreement further provided that Uniroyal would from time to time sell Zeta tires to Case, and that Case would purchase Zeta tires from Uniroyal for sale and distribution in accordance with the terms of the Zeta Charter. The agreement provided that it would commence as of March 20, 1973 and continue in force until December 31, 1974, unless sooner terminated. The agreement further provided that it might be terminated by either party at any time upon thirty (30) days notice, during which period Uniroyal would be required to deliver to Case only such Zeta tires as had already been ordered from Case by his customers, not in excess of Case's average purchases for any thirty (30) consecutive days during the intercedent operation of the agreement.

There is no evidence that the Zeta Charter was ever formally renewed or extended beyond December 31, 1974, although both parties continued their business dealings after that date and until sometime in early 1977, just as if it remained in effect.

At the outset, Uniroyal supplied tires to Case directly from the Uniroyal factory, but in late 1974, Uniroyal placed into effect the so-called "Mississippi Plan", whereby Case and all other dealers in Mississippi were supplied their tires directly from the Uniroyal company-owned stores, primarily one located in Jackson, Mississippi.

Case was not satisfied with the arrangement pursuant to which it was supplied its tires from the company-owned store, because it believed that the purchase price from the store was higher than the price at which Case had previously purchased tires

directly from the factory (Thames Dep., at 164–65). As a result, Case reduced the volume of its purchases from Uniroyal during 1975 and 1976 and increased its purchases of other brands of tires during that period (Thames Dep., at 203).

In late 1976, Uniroyal embarked on a plan of replacing all the Zeta Charter Agreements with an agreement entitled the "Uniroyal Dealer Agreement." (Burgess Dep., at 45; Roveto Dep., at 64.) Insofar as the controversy between these parties is involved, the only significant difference between the Zeta Charter Agreement and the Uniroyal Dealer Agreement is that the Uniroyal Dealer Agreement did not contain the exclusive territorial provision of the Zeta Charter Agreement.

Although the parties are in disagreement concerning the exact dates, it is agreed that sometime in late 1976 or early 1977 Case was contacted by a representative of Uniroyal who advised them that Uniroyal was replacing all Zeta Charter Agreements with Uniroyal Dealer Agreements, and requested them to sign the new Dealer Agreement. (Thames Dep., at 270; Finch Dep., at 22–23.) Case, however, refused. At some time thereafter, Case was either delivered or mailed a letter signed by Ralph Morelli, the Uniroyal District Manager (Exhibit "I", Morelli Dep.; Thames Dep., at 179; Morelli Dep., at 39–40.), which followed a· form supplied to Morelli by Uniroyal management for use when a dealer refused to sign the new agreement (Morelli Dep., at 66.) This letter informed Case that its Zeta Charter Agreement had been terminated. The letter enclosed copies of the Uniroyal Dealer Agreement which Case was requested to sign. The letter further provided that if Case continued to refuse to sign the Dealer Agreement, Uniroyal would nevertheless continue to sell tires to Case.

Uniroyal personnel testified through deposition that the reason for elimination of the Zeta Charter Agreement was that it applied only to Zeta tires, a particular type of guaranteed mileage tire manufactured by Uniroyal. (Burgess Dep., at 27–28; Roveto Dep., at 24–25.) The guarantees applicable to those tires have been withdrawn, the product line for the tire was diminishing, and there was a great possibility that the Zeta tire would be phased out. Zeta tires would continue to be offered, but only as part of the regular Uniroyal brand and covered by a new Uniroyal Dealer Agreement, which would be the only dealer agreement offered by Uniroyal. Prior to the implementation of the plan to replace the Zeta Charter Agreement with the Uniroyal Dealer Agreement, both forms of dealer agreements had been in effect with various dealers throughout the United States. (Roveto Dep., at 56–58.)

Case refused to sign the new Dealer Agreement (Thames Dep. at 270), and beginning in February, 1977, Case refused to make any further payments on the accounts owed to Uniroyal. The accounts included amounts owed for merchandise recently ordered, together with the balance outstanding on funds advanced by Uniroyal in 1973 as a credit against merchandise ordered by Case at that time. (Thames Dep., at 478.)

Subsequently, Uniroyal placed this claim in the hands of its attorneys for collection of some $30,000.00 which it alleged was owed by Case, Thames, and Hoff. This suit was filed and Case responded with the counterclaim in question.

b. Uniroyal's Dealings With Otasco

Otasco is a corporation organized under the laws of the State of Nevada with its principal place of business in Oklahoma. It owns several hundred stores located generally in the southern part of the United States, and also supplies several hundred dealer-owned stores located in the same general area. The Otasco stores and dealers sell a general line of hardware appliances and automobile related products. Prior to 1977, Otasco had purchased its tire needs from another manufacturer.

Uniroyal's negotiations with Otasco began in the latter half of 1976 when Uniroyal learned that Otasco might be interested in replacing the brand of tire then marketed by Otasco with a major brand of tire. (Roveto, at 61–62; Osterstrom, at 4–5.) Subsequently, Uniroyal made several visits

to discuss the possibility of Otasco's purchase of the Uniroyal tire line, and in late 1976, after substantial negotiation and discussion, an arrangement was made, the effect of which was that Otasco would procure its tire needs from Uniroyal. Because of the complexity and magnitude of converting Otasco's sales and distribution effort to Uniroyal tires, implementation of the changeover took several weeks, and Uniroyal tires were placed in the hands of Otasco's stores and dealers in February and March of 1977.

## CONCLUSIONS OF LAW

### I. THE SHERMAN ACT CLAIM

■ Case contends that Uniroyal's agreement with Otasco constitutes a violation of the Sherman Act. Case's Amended Complaint provides no details with respect to the nature of the alleged Sherman Act offense, and does not even specify which section of the Act is alleged to have been violated; however, the Court understands, based on Case's memorandum, that it alleges a violation of Section 1 of the Act. Case's answers to interrogatories inquiring as to details of the allegedly illegal agreement say no more than that the agreement is contained in certain documents attached to those answers, which are simply Uniroyal documents describing the details of the buying arrangement between Uniroyal and Otasco.

Case contends in its memorandum in opposition to the instant motion that the following facts or permissible inferences therefrom and thus constitute disputed material questions of fact:

(a) That prior to and during negotiations with Uniroyal, Otasco was concerned about the competition its stores would face in localities already served by dealers of any major brand of tires it might select;

(b) That Uniroyal replaced the Zeta Charter (and its exclusive territory provision) at about the same time that it made its selling arrangement with Otasco; and

(c) That it can be inferred that Uniroyal removed the exclusive territorial arrangement at the request of, and in concert, with Otasco.

Assuming, for the sake of this Motion, that Case's view of the facts and the inference to be drawn therefrom is correct, nevertheless, the Court is of the opinion that the agreement between Uniroyal and Otasco, even if it had expressly provided that Uniroyal would remove the exclusive territorial provisions in the existing Zeta Charters, would not, without more, be violative of the Sherman Act.

Both parties agree that the applicable law in this circuit is set ,out in *Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107 (5th Cir. 1980), which restates the rule, enunciated in numerous other cases,[1] that a manufacturer may lawfully agree to sell its products to a new dealer, even if the manufacturer and the new dealer agree that the manufacturer will deal with the new dealer to the exclusion of trading with the old dealer.

In *Aladdin,* the Fifth Circuit, affirming a grant of summary judgment for the defendant, quoted with approval the following language from *Joseph E. Seagram & Sons v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71, 78 (9th Cir. 1969), *cert. denied* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970):

We think it indisputable that a single manufacturer or seller can ordinarily stop doing business with A and transfer his business to B. All of the cases cited [above] stand for this rule. The rule is also expressly recognized in the cases upon which appellee relies, and which we have discussed. There is language in many of those cases which, taken out of context, plaintiff construes as meaning that, if the seller agrees with a third-party—a competitor of the seller, for example or a competitor of A—to do the same

---

1. *See, e. g., Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126 (2nd Cir. *en banc* 1975), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978); *Dougherty v. Continental Oil Co.,* 579 F.2d 954, 961, n.3 (5th Cir. 1978).

thing, a per se violation of section 1 has occurred. This obviously cannot mean an agreement with B, the new distributor; he could not accept the distributorship without agreeing to do so. *And the decisions cited [above] make it clear that the decision of the seller to transfer his business from A to B is valid even though B may have solicited the transfer and even though the seller and B may have agreed before the seller terminates his dealings with A.* No case cited to us, and none that we have found, actually goes so far as plaintiff claims. 603 F.2d at 1114–15. (Emphasis added.)

The Fifth Circuit then stated: "We believe this analysis controls . . ." 603 F.2d at 1115, and "The law is clear that merely changing from one exclusive distributor to another is permitted." 603 F.2d at 1117. Thus, the Fifth Circuit affirmed the decision of the district court granting summary judgment with respect to the Sherman Act claim.

In *Dougherty v. Continental Oil Co.*, 579 F.2d 954, 961 n.3 (5th Cir. 1978), the Fifth Circuit succinctly summarizing the prevailing law noted that "a manufacturer may generally determine the method of distribution" by which to market its products, and "may terminate even a successful dealer and select another even if the arrangement was solicited by the second distributor." Only when the selection of one distributor or method of distribution is "anticompetitive," *i. e.*, where it is "taken expressly to drive the plaintiff out of business"; or "to force the plaintiff to accept resale price restrictions or territorial allocations"; or "to increase the manufacturer's market dominance"; or if the manufacturer "engages in predatory prices", can there be a Sherman Act violation. Absent such considerations, however, a manufacturer may, as the *Aladdin* Court held, change from one distributor to another without fear of antitrust sanction.

Therefore, even assuming that Uniroyal and Otasco expressly agreed that Uniroyal would substitute nonexclusive dealer agreements for the Zeta Charters—an assumption wholly lacking evidentiary support here—this would not constitute a violation of the Sherman Act. If a manufacturer may totally eliminate one dealer in favor, and at the request, of a second, *a fortiori* it may elect to market through two nonexclusive dealers rather than through an exclusive one.

Recognizing these obstacles, Case seeks to circumvent them by suggesting that the Uniroyal-Otasco agreement was "anticompetitive" because it was undertaken "expressly to drive [Case] out of business," *Dougherty, supra.* That theory, however, is completely unsupported by fact, or by any reasonable inference [2] from any fact before the Court. Uniroyal never refused to do business with Case, but rather, specifically offered to continue doing business with Case, with or without a dealer agreement. The only action Uniroyal took was to change the exclusive territory provisions that Case had enjoyed. Since Uniroyal was at all times willing to continue selling tires to Case, it is impermissible to infer an intent on Uniroyal's part to drive Case out of business.

Moreover, Uniroyal's witnesses, Burgess and Roveto, specifically testified that there was no connection between Uniroyal's decision to abandon the Zeta Charter marketing concept and its negotiations with Otasco. (Burgess Dep., at 28; Roveto Dep., at 61–62). That evidence is uncontradicted in this record.

Under the principles enunciated in *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), an antitrust claimant "cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion." 391 U.S. at 289, 88 S.Ct. at 1592, nor is an

---

**2.** As the Fifth Circuit has recently stated, only *reasonable* inferences may be indulged in passing on summary judgment motions. "If a frog be found in the party punch bowl, the presence

of a mischievous guest—but not spontaneous generation—may reasonably be inferred." *Am. Tel. & Tel. Co. v. Delta Communications Corp.*, 590 F.2d 100, 102 (5th Cir. 1979).

antitrust claimant "entitled to a full-dress trial notwithstanding the absence of any probative facts tending to support the complaint," 391 U.S. at 291, 88 S.Ct. at 1593.

Finally, the Court notes that there is absolutely no showing of injury to *competition* growing out of these facts. Given Uniroyal's willingness to continue selling tires to Case, the concomitant installation of Otasco as a Uniroyal distributor enhanced rivalry rather than reduced it. Case's argument, like that advanced in *Northwest Power Products, Inc. v. Omark*, 576 F.2d 83, 91 (5th Cir. 1978) "mistakes competitors for competition."

The Sherman Act is "no[t] a panacea for all business affronts which seem to fit nowhere else," *Scranton Construction v. Litton Industries Leasing Corp.*, 494 F.2d 778, 783 (5th Cir. 1974). Consequently, courts "must be on guard against efforts of plaintiffs to use the antitrust laws to insulate themselves from the impact of competition," *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 55 (2nd Cir. 1979).

There is simply no "antitrust wheat" among Case's proffered "bushels of speculative chaff," *Am. Tel. & Tel. Co. v. Delta Communications Corp.*, 408 F.Supp. 1075, 1079 (S.D.Miss.1976), vacated in part on other grounds, 5 Cir., 590 F.2d 100, *cert. den.* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1980). Therefore, Uniroyal's motion for summary judgment on Case's Sherman Act claims will be granted.

## II. THE ALLEGED VIOLATIONS OF STATE LAW

Case also alleges that Uniroyal's conduct violated Section 75–21–1, Miss.Code of 1972, but has cited no authority whatsoever to support its claim that the above complained of activities of Uniroyal are violative of Mississippi law. In the absence of some relevant holding that Mississippi law condemns activity which is not violative of the

federal antitrust laws, summary judgment will be granted to Uniroyal on this claim.

## III. THE ROBINSON–PATMAN ACT CLAIMS

### A. Sale or transfer of tires to company-owned stores.

■ Uniroyal contends that under the rule enunciated in *Security Tire & Rubber Co. v. Gates Rubber Company*, 598 F.2d 962 (5th Cir. 1979), *cert. denied*, 444 U.S. 942, 100 S.Ct. 298, 62 L.Ed.2d 309, transfers by Uniroyal of tires to its own company-owned stores cannot constitute a "sale" for Robinson-Patman Act purposes. In its brief and during oral argument Case conceded that *Gates* forecloses its claim based on such transfer prices. Accordingly, summary judgment will be granted in favor of Uniroyal with respect to Case's claim that Uniroyal violated the Robinson-Patman Act by selling or transferring tires to company-owned Uniroyal stores at prices lower than the price at which Case purchased tires from Uniroyal.[3]

### B. Sales to Mississippi Dealers.

Uniroyal has moved for summary judgment on Case's claim that Uniroyal sold tires to other dealers in Mississippi at a lower price than the price at which Case purchased tires. In response, Case relies on two depositions: (1) the testimony of Earl Roberson, a former employee of Uniroyal, to the effect that he was instructed not to offer Case the benefit of monthly special promotional prices which he offered to other dealers in his territory (which comprised most of the southern portion of Mississippi); and (2) the testimony of Thames and exhibits thereto identifying several invoices which Case contends demonstrates that other dealers in Mississippi received lower prices than did Case.

As noted above, the discovery in this case has been extensive, and Case has been af-

---

**3.** Case notes, and Uniroyal agrees, that a corollary of this rule is that sales made by Uniroyal—whether by its factory or by company-owned stores—constitutes Uniroyal sales to third-parties, and that the store's sales are the same sales made directly from the factory for purposes of the Robinson-Patman Act.

forded the opportunity to examine all the invoices which are still retained by Uniroyal for sales made to dealers or other customers in Mississippi during the relevant period. The Court is informed that Case has taken advantage of that opportunity, examining literally thousands of invoices.

█ Roberson's deposition testimony falls far short of creating a material issue of fact as to whether other dealers in competition with Case purchased tires at a lower price than Case. In addition to the other elements required to establish a violation of the Robinson-Patman Act, one prerequisite to such a claim is that "there must be actual sales at two different prices to two different actual buyers." *M C Manufacturing Company, Inc. v. Texas Foundries, Inc.,* 517 F.2d 1059, 1065 (5th Cir. 1975). As the Court noted in *M C Manufacturing,* "The term 'purchaser' means a buyer or vendor, not one who merely seeks to purchase." (Emphasis added). At most, Roberson's testimony indicates that Case was not *offered* tires at the same price at which others were *offered* tires. The testimony provides no proof that Case actually *purchased* tires at different prices. Thus, Roberson's testimony does not satisfy the "two sales" requirement discussed in *M C Manufacturing.*

In his deposition Mr. Thames produced approximately twenty-five invoices that he had gleaned from Uniroyal's sales invoices during discovery. Thames testified that these documents reflected sales to other dealers in Mississippi at a lower price than Case's purchase price; he further testified these invoices were the only transactions that he had discovered through his examination of the Uniroyal invoices.

The purchasers identified by Mr. Thames were a dealer in Pascagoula, three dealers in Jackson, a dealer in Morton, a dealer in Louisville, a dealer in Greenwood, and one individual purchaser (not a tire dealer) in Crystal Springs.

We note that Case has defined, in sworn answers to interrogatories, the trade area from which it contends it draws its customers. According to its own answers, and the testimony of Mr. Thames, Case considers its trade area to include the area extending approximately 75 miles west of Brookhaven to Natchez, approximately 70 miles north of Brookhaven to Jackson, approximately 120 to 130 miles east of Brookhaven to Hattiesburg, and approximately 50 miles south of Brookhaven to Tylertown. (Thames Dep., at 461; Case's Answers to Uniroyal's Interrogatory No. 43). Accepting for purposes of this motion Case's definition of its trade area, it is apparent, and the Court takes judicial notice, that the dealers in Pascagoula, Morton, Louisville, and Greenwood are not in Case's trade area. There is no evidence whatsoever that Case is in competition with dealers in those locations. The sale of one tire to an individual located in Crystal Springs was, according to Mr. Thames' testimony, a sale to a person who is not a tire dealer, and who thus was not in competition with Case.

Therefore, the only favored purchasers identified by Case are the three dealers located in Jackson, Mississippi. Case has identified only one favored "sale" with respect to each of those three dealers. According to Mr. Thames' comparisons, one dealer (Wilson's Standard) purchased tires at a 26 cent lower price than Case's price. According to Mr. Thames, Case purchased four of those tires, making a total "overcharge" of $1.04.[4] Next, Worley's service station purchased tires at a discount of $3.03 each. Case purchased 38 tires, providing a total "overcharge" of $117.04.[5] Finally, one dealer in Jackson received a $5.49 lower price on one type of tire. Case purchased 12 of those tires; thus Case contends it was discriminated against to the extent of $65.88.

The total of the alleged overcharges to Case—as compared to other dealers' pur-

---

**4.** The Court notes that Exhibit 28 to Thames' Deposition indicates Case purchased its four tires nearly three months after Wilson Standard made its purchase.

**5.** Exhibit 25 to Thames' Deposition indicates that Case purchased its tires almost three months after the Worley purchase.

chases within the area which Case considers to be its trade area—is less than $200.00.[6] This type of price difference is *de minimis*. As the Fifth Circuit held in *Hanson v. Pittsburgh Plate Glass Industries, Inc.*, 482 F.2d 220, 224 n.8 (5th Cir. 1973), "These *de minimis* sales do not violate § 2(a) since the section applies only where 'the effect of such discrimination may be *substantially* to lessen competition.'" [Emphasis added.] *See Skinner v. United States Steel Corp.*, 233 F.2d 762, 764 (5th Cir. 1956). *See also Whitaker Cable Corporation v. F. T. C.*, 239 F.2d 253 (7th Cir. 1950), *cert. denied* 353 U.S. 938, 77 S.Ct. 813, 1 L.Ed.2d 761. *Willowrun Garden Shop, Inc. v. Mr. Christmas, Inc.*, 1973—2 Trade Cas. ¶ 74,816 (D.C.N.J. 1973).

In light of the *de minimis* nature of the sales identified by Case, and in the absence of any evidence that those sales had the required *substantial* effect on commerce, the Court concludes that there is no material issue of fact with respect to Case's claim that Uniroyal violated the Robinson-Patman Act with respect to sales to other dealers.

Moreover, even if the above sales were not *de minimis*, standing alone they do not supply any evidence of a genuine issue of material fact with respect to an essential element of Case's claim—cognizable injury as a result of the alleged discrimination. In *Chrysler Credit Corp. v. J. Truitt Paine, Inc.*, 607 F.2d 1133 (5th Cir. 1979), the Court noted that in order to recover treble damages under Section 4 of the Clayton Act, a plaintiff must prove, *inter alia*, cognizable injury attributable to the violation. The Fifth Circuit held that mere proof of the alleged price discrimination is not sufficient to establish injury. The Court rejected the "automatic damages" concept and recognized that when a seller charges different prices to different customers, injury to competition does not necessarily result. The Court noted that: "Competition is harmed only to the extent that the favored purchas-

er, by use of discriminatory price difference actually draws sales or profits from his unfavored competitor." 607 F.2d at 1136. The Court went on to hold that although in cases brought by the F.T.C. charging a violation of Section 2(a) of the Robinson-Patman Act, injury may be inferred from substantial price difference, the same showing is not sufficient to support a private action for damages.

■ Mere proof of an overcharge is not sufficient to establish a violation of the Robinson-Patman Act. In a case brought under another act prohibiting price discrimination, namely, one involving shipping charges, the Supreme Court stated:

Overcharge and discrimination have very different consequences, and must be kept distinct in thought . . . . [A party who has paid a discriminatory price] is to recover the damages that he has suffered, which may be more than the preference or less ... but which, whether more or less, is something to be proved and not presumed . . . . *The question is not how much better off the complainant would be today if it had paid a lower rate. The question is how much worse off it is because others have paid less.*

The answer to that question is not independent of time and place and circumstances. It calls for something more than the use of a mathematical formula. If by reason of the discrimination, the preferred producers have been able to divert business that would otherwise have gone to the disfavored shipper, damage has resulted to the extent of the diverted profits. If the effect of the discrimination has been to force the shipper to sell at a lowered market price . . ., damage has resulted to the extent of the reduction. But none of these consequences is a necessary inference from discrimination without more. *Interstate Commerce Commission v. United States*, 289 U.S. 385, 390–91, 53 S.Ct. 607, 609–10, 77 L.Ed. 1273 (1933). (Emphasis added).

6. For purposes of this motion, the Court assumes that the cost difference cannot be explained by factors such as the disparate dates

or the application of quantity discounts equally available to Case and the other purchasers.

Case's claim with respect to lost sales or customers is at most a nonfactual conclusion that it must have lost some customers because of discrimination. However, it is not enough for a plaintiff to advance the "naked, nonfactual conclusion that is had 'lost some customers' ... [T]he plaintiff must support his claimed loss of business with 'reliable figures'." *Alexander v. Texas Company*, 165 F.Supp. 53, 58 (W.D.La. 1958). *See also Enterprise Industries, Inc. v. Texas Co.*, 240 F.2d 457 (2nd Cir. 1957) *cert. denied*, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914.

In this case, where the only evidence of any overcharges as compared to other sales in Case's claimed trade area involved only three sales and no more than $200.00 worth of overcharges to Case; where the three sales involved three separate dealers 70 miles away in Jackson, Mississippi; and where there is no testimony or evidence whatsoever showing that Case lost any sale or decreased any profit as a result of the price charged by any of these three "favored dealers", Case has totally and completely failed to present any evidence to create a genuine issue as to whether it suffered any cognizable injury as a result of these three sales to three dealers in Jackson, Mississippi.

It is appropriate to grant summary judgment in a case where the complaining purchaser produces no evidence which indicates that it lost sales or profits to the favored purchaser. *See e. g., Krieger v. Texaco, Inc.*, 373 F.Supp. 108 (W.D.N.Y. 1973); *McCaskill v. Texaco, Inc.*, 351 F.Supp. 1332 (S.D.Ala.1972); *aff'd sub nom. Harrelson v. Texaco, Inc.*, 486 F.2d 1400 (5th Cir. 1973); *Youngson v. Tidewater Oil Company*, 166 F.Supp. 146 (Dist.Or.1958); *Sheffield v. Texaco*, 1957 Trade case ¶ 68657 (W.D.La.1957); *Alexander v. Texas Company*, 165 F.Supp. 53, 58 (W.D.La.1958); *Alexander v. Texas Company*, 149 F.Supp. 37, 41 (W.D.La.1957).

### C. Sales to Otasco.

#### 1. No Cognizable Injury

As above, there is no evidence in the record to create a genuine issue as to whether Case lost any sales or profits as the result of any sales by Uniroyal to Otasco. Case has not identified any particular sales lost to Otasco or any loss of profits, as a result of Uniroyal's lower prices to Otasco. (Case's answer to Interrogatory No. 23, Thames' deposition 227–28.) Also, it has produced no evidence whatsoever—other than Mr. Thames' statement that he must have lost some customers—which would support such a claim. Such a general, conclusory, nonfactual statement is simply not enough to establish a question of fact, and summary judgment is appropriate on this claim as well. *See e. g. Enterprise Industries, Inc. v. Texas Company*, 240 F.2d 457 (2nd Cir. 1951) *cert. denied* 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914; *McCaskill v. Texaco, Inc.*, 351 F.Supp. 1332, *aff'd Harrelson v. Texaco, Inc.*, 486 F.2d 1400 (5th Cir. 1973).

#### 2. Cost Justification

Section 2(a) of the Robinson-Patman Act (15 U.S.C. § 13) provides that it is unlawful for a seller to discriminate in price between different purchasers of commodities of like grade and quality. The same section, however, creates an exception in favor of cost differentials that are justified by cost savings realized on sales to some customers, but not to others. Thus the statutory exception states that "nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale or delivery resulting from differing methods or quantities in which such commodities are to such purchasers sold or delivered."

As a second and alternate basis for summary judgment on the complaint concerning its sales to Otasco, Uniroyal contends that any price differentials granted by it to Otasco with respect to tires of like grade or quality sold by it to both Otasco and Case are the result of such savings to Uniroyal in its sales to Otasco. Otasco is a large company which markets products, including tires, in a wide geographic area to its company-owned outlets and to "associate," or

privately owned, retail stores that it franchises.

Uniroyal perceived from its experience with other large accounts that it could realize substantial cost savings by dealing with a customer that would relieve Uniroyal of the cost of performing certain functions that, in sales to smaller, independent purchasers, it was required to perform. (Uniroyal's Answers to Case's Third Set of Interrogatories No. 13; Osterstrom Dep., at 49–52). For example, Otasco functions much like a wholesaler, purchasing tires in bulk, storing them in its warehouse and redistributing them to its various stores, which allowed Uniroyal to reduce its freight and handling costs by shipping tires in carload lots to the four Otasco warehouses, rather than making small shipments to Uniroyal's more than 6000 dealers. Again, by selling to Otasco, Uniroyal was relieved of credit and bad debt concerns that it would necessarily have with respect to sales to smaller, independent outlets, such as Case. The counter-defendant was also specifically relieved of its cost of the cooperative advertising campaign available to all dealers, including Case, whereby 50–60% of the cost of certain dealer advertising was borne by Uniroyal. Not only was Uniroyal relieved of the direct cost of such advertising, but it was also relieved of administrative cost relating thereto. Although it made no formal study specifically quantifying such apparent cost savings prior to its contract with Otasco, it has subsequently done so. A study performed by Mr. Ken Anderson, Divisional Plant Coordinator of Uniroyal's Detroit Tire Plant, has been introduced (Anderson's Dep., Ex. I), and Mr. Anderson's testimony has been taken by deposition. The thrust of his study is that the total savings attributable to sales to Otasco was no less than 17.28%, compared to its tire sales to dealers such as Case. It is undisputed that the discount granted to Otasco by Uniroyal, while styled a "15% functional discount", actually resulted in a price reduction to Otasco of only 11.7%, because the base price to which the discount is applied is reduced by other discounts available to Case and Otasco. Accordingly, it appears that

Uniroyal's prices to Otasco were justified by its cost savings with respect to such sales. On the record, the testimony of Mr. Anderson stands uncontradicted. Case has pointed to no errors or omissions in Mr. Anderson's study. Case has offered no cost study of its own, but argues instead that a Section 2(a) "cost justification" study is an affirmative defense, the burden of proof of which rests upon Uniroyal, and that Anderson's conclusions are "subject to test on cross-examination."

■ It is firmly established that the burden of proof on a Section 2(a) cost justification defense rests upon the party raising that defense. The difficulty with Case's argument here is that, in the Court's opinion, Uniroyal has assumed that burden and has sustained it. Case has in fact cross-examined Mr. Anderson, yet suggests no factors, such as inherent implausability or contradiction by other evidence, that would negate the effect of his testimony for summary judgment purposes. *Cf. Brown v. Ford Motor Company*, 479 F.2d 521, 523 (5th Cir. 1973). Case has offered no evidence to contradict the Anderson study, nor to render it suspect. Consequently, it stands unimpeached, and justifies the price differentials granted to Otasco by Uniroyal.

Case argues, based on *United States v. Borden Co.*, 370 U.S. 460, 82 S.Ct. 1309, 8 L.Ed.2d 627 (1962), that the Uniroyal cost justification study is invalid because it compares costs to one large customer with costs to other customers. That argument is misplaced. *Borden* does not condemn all cost studies based on classifications of customers. 370 U.S. at 468–70, 82 S.Ct. at 1313–14. The Anderson comparisons are not, as in *Borden*, "like comparing one horse and one rabbit" 370 U.S. at 470, 82 S.Ct. at 1314. Mr. Anderson compared Uniroyal's costs to Otasco with certain of its costs to various other customers, including large Uniroyal dealers, all Uniroyal dealers, and company-owned stores.

Case's argument appears to suggest that it is impermissible to group or classify customers for cost study purposes. But that is

not the law. Reasonable and proper classifications made for purposes of cost comparisons are clearly permissible, as the Fifth Circuit recognized in *Thomasville Chair Company v. FTC*, 306 F.2d 541, 544 (5th Cir. 1962). Moreover, it is firmly established "that individual cost justification is not required," *FTS v. Standard Motor Products, Inc.*, 371 F.2d 613, 619 (2nd Cir. 1967).

Case does not point to any specific comparisons that it contends are unreasonable or improper; it relies instead upon its broad-brush assertion that Uniroyal's classifications for cost study purposes vitiate the entire study, an approach rejected in *Thomasville Chair, supra*, 306 F.2d at 544. Nor has Case suggested any alternative means of classifying customers, and to uphold its broadside attack would mean that Uniroyal "has left [to] it no practicable means of cost justification." *Standard Motor Products, Inc., supra*, 371 F.2d at 619, a result clearly "at war with Congress' language and purpose." *Id.*

██ Absent any evidence to the contrary, Uniroyal's cost study, and the comparisons that comprise it, are reasonable. Accordingly, Uniroyal's sales to Otasco did not violate Section 2(a), and Uniroyal's motion for summary judgment relating to this claim will be granted. The same reasons discussed above that warrant summary judgment in favor of Uniroyal on its cost justification defense mandate denial of Case's cross-motion for summary judgment on that same defense.

## IV. THE CONTRACT CLAIM

██ Case contends that Uniroyal violated its contract with Case by selling Uniroyal tires to Otasco. However, this Court is of the opinion that the contract expired under its own terms on December 31, 1974. (See Exhibit 1 to Thames' Dep.) Furthermore, since there is no evidence of any other written agreement between the parties nor evidence that the charter would be renewed for annual periods after December 31, 1974, we are of the opinion that any agreement, if any, between the parties after December 31, 1974, would have been for an indefinite period and thus, terminable at will by either party upon reasonable notice to the other party. *Roberts v. Southern Wood Piedmont Co.*, 571 F.2d 276, 278 (5th Cir. 1978); *Hazell Machine Company v. Shahan*, 249 Miss. 301, 161 So.2d 618 (1964); and *United States Finance Company v. Barber*, 247 Miss. 800, 157 So.2d 394 (1963).

According to Mr. Thames, Uniroyal gave Case notice in writing in late February, 1977 that all Zeta Charters were being phased out. (Thames' Dep. at 465–66). In this written notice Uniroyal expressly offered to enter into a Dealer Agreement with Case or to continue to sell tires to Case without any Dealer Agreement (Morelli Dep., Exhibit 1). However, Case refused.

Assuming *arguendo*, that the Zeta Charter was still in existence after December 31, 1974, during the time in which Uniroyal began supplying tires to Otasco, we still find the absence of a breach between Uniroyal and Case. The Zeta Charter stated that "Within the charter area, the company will not deliver *Zeta tires* to any other retail or wholesale establishment." (Emphasis added). The evidence is undisputed that Zeta tires were a particular type of mileage guarantee tire manufactured by Uniroyal and that not all Uniroyal tires are Zeta tires. (Roveto Dep., at 24–25). Case has not pled, and there is no evidence whatsoever to support, that Uniroyal ever delivered any Zeta tires to Otasco's Brookhaven store, and certainly there is no evidence that such tires were delivered prior to the date that, according to Mr. Thames' testimony, the charter was terminated.

Case suggests that in spite of the unequivocable language of the 1973 contract, it really provided an exclusive arrangement for all Uniroyal tires. However, Case has not submitted any evidence, by deposition, or affidavit, or otherwise, that would vary the above quoted plain and clear language. It is true that Mr. Thames testified that the

Charter covered all Uniroyal tires, and not just Zeta tires. (Thames' Dep. at 269); however, this is no more than Mr. Thames' interpretation of the agreement, and even Thames did not testify that the contract was ever amended by Uniroyal to encompass or include all Uniroyal tires. Consequently, this testimony raises no fact issues; at most it presents the witness' opinion of the agreement's *legal* effect.

From the clear and unambiguous language of the agreement, the Court concludes that the Zeta Charter provides an exclusive territorial arrangement only for Zeta tires. In the absence of any allegation indicating any amendment or modification of that agreement, Case has the burden of showing that Uniroyal delivered Zeta tires into the Charter area. Case's pleadings do not allege such delivery, nor has Case advanced such delivery in argument to the Court. The thrust of Case's argument is that the Zeta Charter applied to *all* Uniroyal tires, an argument this Court rejects. Consequently, there is no fact issue involved, and we therefore conclude that summary judgment in favor of Uniroyal is appropriate on the breach of contract claim asserted by Case.

Uniroyal is entitled to, and shall be granted, summary judgment as to all counterclaims asserted against it by Case.

An order conforming with this memorandum opinion, approved as to form by all counsel, should be presented to the Court within the time and in the manner prescribed by the Local Rules.