Allan **RUDNER**, dba Allan Drugs,
et al., Plaintiffs,

v.

**ABBOTT LABORATORIES**, et
al., Defendants.

No. C84–998–A.

United States District Court,
N.D. Ohio, E.D.

June 18, 1987.

Eugene F. McShane, Ralph E. Breitfeller and Alan C. Witten, Columbus, Ohio, for plaintiffs.

John D. Jolliffe, Ronald Bennington and Randolph L. Snow, Canton, Ohio, for Timken Mercy Medical Center, Inc.

Norman S. Carr and Ronald S. Kopp, Akron, Ohio, for Abbott Laboratories, Inc.

John F. McClatchey and Mark F. Kennedy, Thompson, Hine & Flory, Cleveland, Ohio, for McKesson Corp.

## ORDER

BELL, District Judge.

Plaintiffs filed this action on March 23, 1984 against defendants for injunctive relief and for treble the damages suffered as a result of defendants' alleged violations of section 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13, and sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. The court's subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1337 and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

The six plaintiffs in this case include an individual and five Ohio corporations engaged in the retail pharmacy business in the Stark County, Ohio area. This action was originally brought against four defendants, Abbott Laboratories, Inc. (Abbott), McKesson Corporation (McKesson), Warner Lambert Company, and Timken Mercy Medical Center (Timken Mercy). The court approved the voluntary dismissal with prejudice of the Warner Lambert Company on May 20, 1986. Each of the three remaining defendants have moved for summary judgment in whole or in part.

The plaintiffs contend in their complaint that Abbott, a manufacturer, distributor and seller of pharmaceutical, hospital and laboratory supplies, and McKesson, a wholesale distributor of ethical and proprietary pharmaceuticals, discriminated in price of pharmaceutical products sold to different purchasers. Specifically, they contend that they were sold products of like grade and quality at higher prices and on less favorable terms than those extended to defendant Timken Mercy which resold the products in the Timken Mercy Professional Pharmacy (retail pharmacy), an establishment in competition with the plaintiffs. This course of conduct it is alleged, resulted in a substantial lessening in the competition between the plaintiffs and Timken's retail pharmacy. Plaintiffs further contend that defendant Timken Mercy has sought to monopolize the market for pharmacy product sales to nursing homes for the purpose of excluding plaintiffs and other competitors in that market. Finally, plaintiffs allege that defendant Timken Mercy has unlawfully tied the sale of prescription drugs for clients of the Visiting Nurse Society to the sale of home hyperalimentation supplies and services. The result of this tying arrangement is allegedly that plaintiffs and others have been foreclosed from substantial sales of prescription drugs and pharmaceutical supplies to the Visiting Nurse Society and to persons whose purchases of such drugs and sup-

plies are in whole or in part reimbursed by the Visiting Nurse Society.

Each defendant has submitted motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiffs have responded in opposition to each motion. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the party moving for summary judgment has the burden of showing that no genuine issue of material fact exists and that as a matter of law, it is entitled to summary judgment. In reviewing a motion for summary judgment, a court must consider the pleadings, related documents and evidence and all reasonable inferences in a manner most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Smith v. Hudson*, 600 F.2d 60 (6th Cir.1979); *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415, (1979); *Board of Ed. Cincinnati v. Department of H.E.W.*, 532 F.2d 1070 (6th Cir.1976). This standard is applicable to appropriate antitrust litigation even though summary judgment is generally disfavored in such litigation and the standard for granting it is strict. *Bouldis v. U.S. Suzuki Motors Corp.*, 711 F.2d 1319, 1324 (6th Cir.1983) (and cases cited therein). Each motion and the evidence submitted in support of it will be separately considered under this standard.

## I. Abbott's Motion for Summary Judgment

Defendant Abbott is engaged in the manufacture, distribution and sale of hospital products in the State of Ohio and throughout the United States. Defendant Timken Mercy is an Ohio not-for-profit corporation which operates an acute care hospital in Stark County. There are two pharmacies within and owned by Timken Mercy, an internal pharmacy (medical center pharmacy) which provides pharmacy goods and services for the hospital's own use and the retail pharmacy, which sells goods and services to the general public. These pharmacies are separately licensed as distributors of dangerous drugs by the State of Ohio and are located in separate buildings.

Defendant Abbott is only named as a defendant in Count I of the complaint which contains allegations brought pursuant to section 2 of the Clayton Act, as amended by the Robinson-Patman Act. 15 U.S.C. § 13. Plaintiffs, each of whom compete for sales with the retail pharmacy, claim that defendants Abbott and McKesson have sold equivalent pharmaceutical products to Timken Mercy at prices lower than those charged the plaintiffs. The device allegedly used for this discriminatory pricing is volume discounts based on the total amount of product purchased by Timken Mercy for its own use and not based on the amount purchased solely by the retail pharmacy. Competition is alleged to have been lessened in that plaintiffs must pay higher prices for the pharmaceutical products it buys from these defendants resulting in a substantial loss to plaintiffs.

In its motion for summary judgment, Abbott advances two theories either of which it claims supports such relief. First, it is alleged that there has been no effect on competition in connection with the *de minimus* sales by Abbott and, therefore, plaintiffs have no standing to allege a Robinson-Patman Act violation. Second, Abbott claims that even if product was sold to Timken Mercy at a different price, Abbott received the requisite certification from the medical center pharmacy that it is a not-for-profit corporation and that it purchased product from Abbott for its own use, thereby rendering Abbott's sales to Timken Mercy exempt from Robinson-Patman pursuant to the Nonprofit Institutions Act, 15 U.S.C. § 13c.

Whether Abbott's sales to Timken Mercy are exempt from the application of Robinson-Patman by virtue of the Nonprofit Institutions Act will be considered first. Robinson-Patman prohibits persons engaged in commerce from discriminating in prices between purchasers of goods of like grade, quality and quantity. 15 U.S.C. § 13a. Exempt from this prohibition are sales of supplies to non-profit institutions which purchase products for their own use. 15 U.S.C. § 13c. The leading cases on the applicability of this exemption is *Abbott*

*Laboratories v. Portland Retail Druggists Ass'n, Inc.*, 425 U.S. 1, 96 S.Ct. 1305, 47 L.Ed.2d 537 (1976). Mr. Justice Blackmun, writing for the Court, explained the basic interpretation of these two provisions as follows:

> It has been said, of course, that the antitrust laws, and Robinson-Patman in particular, are to be construed liberally, and that the exceptions from their application are to be construed strictly. *United States v. McKesson & Robbins*, 351 U.S. 305, 316, 76 S.Ct. 937, 943, 100 L.Ed. 1209, (1956); *FMC v. Seatrain Lines, Inc.*, 411 U.S. 726, 733, 93 S.Ct. 1773, 1778, 36 L.Ed.2d 620 (1973); *Perkins v. Standard Oil Co.*, 395 U.S. 642, 646–647, 89 S.Ct. 1871, 1873–74, 23 L.Ed.2d 599 (1969). The Court has recognized also that Robinson-Patman "was enacted in 1936 to curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power." *FTC v. Broch & Co.*, 363 U.S. 166, 168, 80 S.Ct. 1158, 1160, 4 L.Ed.2d 1124 (1960); *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968). Because the Act is remedial, it is to be construed broadly to effectuate its purposes. See *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); *Peyton v. Rowe*, 391 U.S. 54, 65, 88 S.Ct. 1549, 1555, 20 L.Ed.2d 426 (1968). Implied antitrust immunity is not favored. *United States v. National Assn. Securities Dealers*, 422 U.S. 694, 719, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486 (1975). "[O]ur cases have repeatedly established that there is a heavy presumption against implicit [antitrust] exemptions." *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 787, 95 S.Ct. 2004, 2013, 44 L.Ed.2d 572 (1975); *United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 350–351, 83 S.Ct. 1715, 1734–35, 10 L.Ed.2d 915 (1963). And the focus of Robinson-Patman is on competition "at the same functional level." *FTC v. Sun Oil Co.*, 371 U.S. 505, 520, 83 S.Ct. 358, 367, 9 L.Ed.2d 466 (1963).

*Id.* at 11–12, 96 S.Ct. at 1313. With these guidelines, the Court concluded that:

> [T]he exemption provision of the Nonprofit Institutions Act is a limited one; that just because it is a nonprofit hospital that is purchasing pharmaceutical products does not mean that all its purchases are exempt from Robinson-Patman; that the test is the obvious one inherent in the language of the statute, namely, "purchases of their supplies for their own use"; and that "their own use" is what reasonably may be regarded as use *by the hospital* in the sense that such use is a part of and promotes the hospital's intended institutional operation in the care of persons who are its patients.

*Id.* at 14, 96 S.Ct. at 1314 (emphasis in original).

In order to be protected from antitrust liability, a nonprofit institution which purchases product from a supplier at lower prices than those offered to retail operations may either not resell those products for nonexempt purposes or develop a record-keeping system to account for purchases for exempt and nonexempt uses. *Id.* at 20, 96 S.Ct. at 1317. The natural result of this record keeping would be the later submission of an accounting to a supplier for any price adjustment due to resale of product for nonexempt uses. Although the Court set out both of these choices as acceptable, it noted that these are not the only methods possible and that other, more efficient methods may exist. *Id.* at n. 11, 96 S.Ct. at 1313 n. 11.

As to the supplier, protection from antitrust liability will be afforded when there is "reasonable and noncollusive reliance upon its hospital customer's certification as to its dispensation of the products it purchases from the supplier." *Id.* at 20–21, 96 S.Ct. at 1317. Because the supplier enjoys the benefits of the Nonprofit Institutions Act exemption, however, a two-part burden is imposed upon it: first, it must identify its purchaser as a nonprofit institution; and, second, it must routinely obtain a representation from the nonprofit institutional cus-

tomer as to the use of the purchased products. *Id.* at 21, 96 S.Ct. at 1317.

In this case, it is not disputed that Timken Mercy is a nonprofit institution which operates an internal pharmacy and a retail pharmacy. Complaint at ¶ 13. It is also undisputed that Abbott sells pharmaceutical products in interstate commerce, Complaint at ¶ 16, and has sold such products to the medical center pharmacy. *Id.* at 26, and Schiavone Deposition Exhibits 56, 59, 62, 63, 64, 65, 66, 70, 71.

Mr. Joseph D. Schiavone, Director of Pharmacy at Timken Mercy, began the planning process for the retail pharmacy in the latter part of 1979 in conjunction with plans to build a medical office building at Timken Mercy. Schiavone Deposition at 72–73, Deposition Exhibit 8. Mr. Schiavone continued to be actively involved in the beginning phases, through opening of the retail pharmacy on September 27, 1982, and thereafter. Schiavone Deposition at 73–79; Deposition Exhibit 8. One of the areas of concern from the beginning of the planning stage of the retail pharmacy was the effect on its operation of the antitrust laws as defined by the Supreme Court in *Abbott Laboratories v. Portland Retail Druggists*, 425 U.S. at 1, 96 S.Ct. at 1308. Schiavone Deposition at 83–84; Deposition Exhibit 8. On the basis of his understanding of that decision, Mr. Schiavone concluded that separate inventories should be maintained by the medical center pharmacy and the retail pharmacy. Schiavone Deposition at 95–96; Deposition Exhibit 9. It was his intent to operate the retail pharmacy in full compliance with the antitrust laws and to compete fairly. Schiavone Deposition at 99.

Abbott sold products under separate accounts to both the medical center pharmacy and the retail pharmacy. Victor V. Flench was Abbott's sales representative in the Stark County, Ohio area where Timken Mercy is located. *See* Affidavit of Victor V. Flench, Abbott's Motion for Summary Judgment, Exhibit B. In that capacity, Mr. Flench spoke to Mr. Schiavone more than once about the medical center pharmacy's intended use of the Abbott products it purchased. *Id.* at ¶ 3. Mr. Schiavone related to him that all products purchased by the medical center pharmacy were intended to be used "in house" and were not intended to be transferred to the retail pharmacy. *Id.* at ¶ 4. Mr. Flench had no knowledge of any transfers to the retail pharmacy. *Id.* at 6. It is stated that had Abbott known of transfers of product between the pharmacies for sale outside of the hospital, continued purchasing under the existing contracts and pricing arrangements by the medical center pharmacy would have been stopped. Affidavit of Robert D. Satterlee, Manager of Major Accounts in the Contract Pricing Department of the Hospital Products Division of Abbott Laboratories, Abbott's Motion for Summary Judgment, Exhibit C.

Plaintiffs contend that, nonetheless, there remain material issues of fact as to whether Abbott met the burden outlined in *Abbott Laboratories v. Portland Retail Druggists Ass'n*, 425 U.S. at 21, 96 S.Ct. at 1317, for a supplier who seeks to benefit from the Nonprofit Institutions Act exemption. Plaintiffs argue that the ultimate issue is not whether the products were sold to one pharmacy or the other but that the ultimate use of the products was, and that if goods were sold by Abbott at discriminatory prices which were thereafter sold to nonexempt classes of customers, there would be a violation of section 2(a) of the Robinson-Patman Act.

The burden imposed on Abbott in order to enjoy the benefit of exemption in this context is to identify its purchaser as a nonprofit institution which is purchasing products for its own use, and to thereafter routinely obtain a representation from its customer as to the use of the products purchased. *Abbott Laboratories v. Portland Retail Druggists*, 425 U.S. at 21, 96 S.Ct. at 1317. It is undisputed that Mr. Schiavone was aware of the requirements of this case, *see* Schiavone Deposition at 83–84, and that Mr. Flench, Abbott's sales representative, identified the medical center pharmacy as a nonprofit institution purchasing products for its own use and within the guidelines of fair competition. Flench

Affidavit at ¶ 3, 4, 5. The first facet of Abbott's responsibility under the Nonprofit Institutions Act was thus met.

Plaintiffs contend, however, that material issues exist as to the second requirement: whether Abbott obtained routine representations related to the use of the products purchased by the medical center pharmacy. Mr. Flench stated that he had more than one discussion with Mr. Schiavone and was informed that the products were to be used in house and not transferred. Flench Affidavit at ¶ 3, 4. Plaintiffs submit that transfers, the extent of which is still unknown, were routinely made between the two pharmacies and that Abbott cannot rely on a self-serving affidavit stating that occasional conversations were held to prove it met its burden of periodic inquiry. Further, plaintiffs submit that material issues of fact exist as to whether Abbott was aware of such transfers.

The depositional testimony of Mr. Schiavone indicates that transfers were in fact made between the pharmacies in conjunction with a formal loan policy and in conjunction with the home health care program originally supplied by the medical center pharmacy but later adopted by the retail pharmacy. In relation to formal loans, policies and procedures were developed by Mr. Schiavone to cover loans of drugs and supplies on an emergency basis between the two pharmacies. *See* Schiavone Deposition at 205; Deposition Exhibits 33, 33A, 33B, 33C, 33D. Mr. Schiavone, aware of the discounted prices given by the drug companies to the medical center pharmacy, knew that adjustment in charge to the average wholesale price would have to be made for items loaned to the retail pharmacy and not repaid in kind within thirty days. Schiavone Deposition at 197, 234 and Deposition Exhibit 33B at 1–2. More specific guidelines were later developed for medical center pharmacy personnel to follow in evaluating whether an emergency existed to justify loans between the two pharmacies. Schiavone Deposition at 209–10, 227–28. Loaning of drugs by hospitals is apparently not uncommon and is usually governed by their own particular procedures. Schiavone Deposition at 227.

It was brought to Mr. Schiavone's attention at one point by the two people in charge of the drug loan program, Mr. Cooper and Mrs. Baker, that the retail pharmacy was borrowing drugs more often than they should. Schiavone Deposition at 231. Mr. Schiavone directed that the drug loans be reduced and asked Mr. Cooper to monitor the program and keep him apprised. *Id.* at 233.

There is no evidence that transfers made pursuant to the emergency loan program were made in collusion with Abbott. However, the evidence before the court does indicate that extensive transfers were made and that records were kept imprecisely. In addition, plaintiffs submit that Abbott had direct knowledge of improper transfers. An Abbott sales representative, Robert Polilli, told Joseph Cusma, president of plaintiff Fulton Drugs, Inc., in late 1982 that he had seen products offered for sale in the retail pharmacy which Abbott had originally sold to the medical center pharmacy. Plaintiffs' Memorandum in Opposition to Abbott's Motion for Summary Judgment, Exhibit 5, Affidavit of Joseph Cusma. Abbott submitted Mr. Polilli's affidavit which admits that he spoke to Mr. Cusma about observing a single box of Abbott's K–LOR product on the retail pharmacy shelves packaged as it would be for hospital use. Supplemental Memorandum in Support of Motion for Summary Judgment, Exhibit B, Affidavit of Robert Polilli at 3. He did not examine the box or its contents and observed no other Abbott products packaged for hospital use. *Id.* Other than the single incident involving K–LOR, Mr. Polilli has no direct knowledge of any stock transfers between the two pharmacies. *Id.*

Regardless of what transfers of pharmaceutical products took place, Abbott contends that it fulfilled its continuing obligation of ascertaining the use of those products by the hospital by including on the invoice for each purchase the following language: "For hospitals own use under nonprofit institutions act." By accepting and paying on this invoice, Abbott contends

that Timken Mercy certified its in house use of the products.

■ The record before this court leaves too many open questions relating to the extent of transfers between the Timken Mercy pharmacies and whether Abbott fulfilled its periodic certification obligation to grant its motion for summary judgment. Specifically, material issues of fact remain as to the extent of the transfers made between Timken Mercy's pharmacies, whether transfers were documented and properly charged, whether the transfers were improper, and if so, whether Abbott knew or should have recognized that such transfers were being made. At this point, the court cannot say that the mere inclusion of a statement on an invoice satisfied Abbott's certification obligation.

The other area of transfers noted by the plaintiffs involved the sale of certain Abbott products for use in relation to a home nutrition program (TPN Program) furnished by the Visiting Nurse Society (VNS). Originally, the TPN Program was administered by the medical center pharmacy but it was thereafter transferred for administration by the retail pharmacy. Schiavone Deposition at 432–33, 442. Once the decision was made to transfer the program, TPN supplies were ordered through the retail pharmacy and medical center pharmacy supplies used in the interim period were replaced with supplies ordered through the retail pharmacy at a higher price. Schiavone Deposition 442, 445, 451, 463. Based on a contract entered on June 1, 1983 between the retail pharmacy and the VNS agreeing that the retail pharmacy would be the exclusive provider of products for VNS programs, Abbott contracted with the retail pharmacy to provide certain products for the VNS programs for a two-year period beginning on September 1, 1984. *See* Memorandum in Opposition to Defendant Abbott's Motion for Summary Judgment, Exhibits 6, 8. Products used for the VNS home hyperalimentation program were purchased from Abbott. *See* Schiavone Deposition 424–67.

■ The structure of the VNS agreement prior to its transfer to the retail phar-

macy is not clear from the record. Products were transferred for distribution by the retail pharmacy at some point prior to its contract with VNS in 1984 but the accounting for these transfers is not yet in evidence. Further, Abbott's knowledge of transfers is still at issue. Abbott contends, however, that summary judgment is appropriate because plaintiffs have not offered any evidence of their own purchases of hyperalimentation products from Abbott and therefore cannot establish a necessary Robinson-Patman element, to-wit: actual sales at two different prices to two different actual buyers. *See M.C. Manufacturing Co., Inc. v. Texas Foundries, Inc.,* 517 F.2d 1059, 1065 (5th Cir.1975), *cert. denied,* 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976). While this point, raised in Abbott's reply brief, may be established at a later time, it was not addressed in the motion and cannot be deemed proven at this stage by the fact the plaintiffs also did not address it in their opposition brief. It is true, however, that the essential elements of a Robinson-Patman claim under 15 U.S.C. § 13(a), as alleged by plaintiffs, include two sales by the seller of commodities of like grade and quality at different prices. *Id.*

The second theory advanced by Abbott is that regardless of their exempt status, its sales of both hospital and pharmaceutical products to the plaintiffs and to Timken Mercy between July, 1982 until the end of 1984 were *de minimus* in both volume and price differentials so as to have had no effect on competition. In order to have an effect on competition under the Robinson-Patman Act, some courts have held that there must be more than *de minimus* sales in both volume and value. *See Hanson v. Pittsburgh Plate Glass Industries, Inc.,* 482 F.2d 220, 224 (5th Cir.1973), *cert. denied,* 414 U.S. 1136, 94 S.Ct. 880, 38 L.Ed.2d 761 (1974); *Whitaker Cable Corp. v. F.T.C.,* 239 F.2d 253, 256 (7th Cir.1957), *cert. denied,* 353 U.S. 938, 77 S.Ct. 813, 1 L.Ed.2d 761 (1954); *Uniroyal v. Hoff and Thomas, Inc.,* 511 F.Supp. 1060, 1068–69 (S.D.Miss.1981). Abbott asserts that there is no material issue of fact as to the unsubstantial effect of its sales on competition in

this case and that, therefore, plaintiffs do not have standing to allege a Robinson-Patman Act violation.

Abbott made sales to Timken Mercy of hospital products and pharmaceutical products. In relation to its hospital products sales, it claims it sold no products between July, 1982 through March 31, 1984 to four of the plaintiffs: Briner's Drugs, Inc., Davies Pharmacy, Inc., Fulton Drugs, Inc., and Rice Drugs, Inc. Abbott's Motion for Summary Judgment, Exhibit D, Affidavit of Denise T. Vickers, custodian of records of Abbott sales of hospital products to retail pharmacies. The full extent of hospital products sold to the remaining two plaintiffs during the relevant period is said to total $135 to Allan Drugs and $94.80 to Nees Pharmacy, Inc. *Id.*

█ In relation to its sales of pharmaceutical products, Russell F. Lehn, Manager, Pricing, Abbott Laboratories Pharmaceutical Division, submitted an affidavit and analysis based on Abbott invoices submitted by the plaintiffs and Timken Mercy through discovery in this case. Supplemental Memorandum in Support of Motion for Summary Judgment, Exhibit A. This analysis does appear to indicate that there was only a *de minimus* effect on competition. It is, however, based on Abbott invoices obtained through discovery to this point. The figures, therefore, may not represent Abbott sales *per se* but only Abbott sales about which plaintiff has obtained evidence. The analysis of the sales by Abbott under these circumstances does not answer issues of fact material to the inquiry of whether sales were *de minimus*.

Accordingly, Abbott's motion for summary judgment is denied.

## II. McKesson's Motions to Dismiss or for Summary Judgment

█ McKesson is a wholesaler and distributor of ethical and proprietary pharmaceuticals to retailers and hospitals including the plaintiffs and Timken Mercy. As with Abbott, plaintiffs name McKesson only in their discriminatory pricing claim in Count I of the complaint. McKesson has submitted a motion for summary judgment relating to its sales to the medical center pharmacy and a motion to dismiss or for summary judgment in relation to the sales it made to. the plaintiffs and the retail pharmacy. In the latter, McKesson contends that virtually all of its sales to the plaintiffs and to the retail pharmacy are made from its North Canton, Ohio distribution center and only one-half of one percent of such sales are "drop shipped" from outside Ohio directly to them. Therefore, it is argued, the interstate commerce requirement of section 2(a) cannot be met because the majority of sales were intrastate and the "drop shipments" were *de mimimus* for jurisdictional purposes. McKesson seeks dismissal of the complaint or entry of summary judgment. This motion, however, does not include sales made to the hospital pharmacy. Plaintiffs have proceeded on the basis that discriminatory pricing was possible by virtue of sales made to the medical center pharmacy at lower prices which were sold at a profit from the retail pharmacy but still at prices lower than plaintiffs could charge. Clearly, then, McKesson's motion as to only sales to the retail pharmacy and plaintiffs does not go far enough and must be denied. There remain material issues of fact involving the sales made by McKesson to the medical center pharmacy.

The other motion filed by McKesson relates to sales made to the medical center pharmacy. Sales made to this pharmacy were in interstate commerce but, McKesson argues, were exempt under the Nonprofit Institutions Act. 15 U.S.C. § 13a. As the court discussed at length in relation to Abbott's motion, to benefit from this exemption McKesson must show that its purchaser was a nonprofit institution and that it obtained routine representations from its hospital customer which were reasonably and noncollusively relied on that it was using the products for its own needs. *Abbott Laboratories v. Portland Retail Druggists Ass'n, Inc.*, 425 U.S. at 20–21, 96 S.Ct. at 1317–18.

█ In order to satisfy this obligation as to the medical center pharmacy, admittedly a nonprofit institution, McKesson set up

accounts for it separate and distinct from the retail pharmacy with different customer numbers, billings, and so on. *See* McKesson's Motion for Summary Judgment, Affidavits of Joseph D. Schiavone and Dominic Rizzo. Mr. Schiavone stated that McKesson would have no way of knowing of transfers of product between the pharmacies, Schiavone Deposition at ¶ 8, and Mr. Rizzo, McKesson's Hospital Account Manager who regularly called on the medical center pharmacy, stated that he has never been informed of any such transfers. Rizzo Affidavit at ¶ 1, 2, 6. Nonetheless, except for the separate accounts there is still a question of fact as to whether representations were sought or received that the products sold were used within the nonprofit institution, and whether there were indications of transfers short of being "informed" of them to put McKesson on notice. *See* Plaintiff's Memorandum in Opposition to McKesson's Motion, Affidavits of William H. Cooper at ¶ 5 and Joanne Nemeikis at ¶ 6, 7.

Accordingly, both motions filed by defendant McKesson are denied.

### III. Timken Mercy's Motion for Partial Summary Judgment

Timken Mercy seeks entry of summary judgment as to Count III of the complaint on the basis that it does not satisfy the statutory jurisdictional requirements contained in section 1 of the Sherman Act. 15 U.S.C. § 1. In Count III plaintiffs alleged an unlawful tying by Timken Mercy of the sale of home hyperalimentation supplies (used to provide a person's nutritional requirement intravenously) and services for reimbursement by the VNS upon the exclusive right to sell prescription drugs and pharmaceutical supplies through its retail pharmacy to persons whose purchases are reimbursed in whole or part by the VNS and to the VNS. Complaint at ¶ 49. Plaintiffs claim they have thus been foreclosed from substantial sales of drugs and supplies to VNS and to persons whose sales and services are in whole or in part reimbursed by VNS. Complaint at ¶ 50.

Timken Mercy contends in its motion that there are no material issues of fact remaining as to the conclusion that there was no adverse effect on interstate commerce, a necessary element of section 1. It is argued that only local sales of products by Timken Mercy are challenged in Count III and, even if some interstate commerce could be shown, it could not be considered substantial enough for jurisdictional purposes.

The VNS, a United Way Agency, is a not-for-profit corporation which partially funds the prescriptions and pharmaceutical supply requirements of qualifying needy individuals in Stark County. Plaintiffs allege that through contracts negotiated by Timken Mercy with the VNS the sale of pharmaceutical products and supplies (the "tied product") which they could sell are tied to the hyperalimentation program and services (the "tying product"). To be an invalid tying arrangement, it must be shown that, through the seller's exploitation of its control over the seller's tying product, it forces the purchaser to buy the tied product which the buyer either did not want or which the buyer might have preferred to buy elsewhere. *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984). The elements of an illegal tying arrangement are:

1. There must be a tying arrangement between two distinct products or services;

2. The defendant must have sufficient economic power in the tying market to appreciably restrain competition in the tied product market.

3. The amount of commerce affected must be "not insubstantial."

*A.I. Root Co. v. Computer/Dynamics, Inc.*, 806 F.2d 673, 675 (6th Cir.1986). Timken Mercy's motion focuses on the third element.

In relation to the issue of whether interstate commerce is alleged or whether merely local (intrastate) sales are involved, Timken Mercy contends that once the pharmaceutical products became part of its inventory, they were no longer in commerce

and subsequent sales could only be deemed "local." While the motion is framed as one for summary judgment, Timken Mercy seems to attack Count III as insufficiently plead, more in the nature of a motion to dismiss. The jurisdictional fact of a substantial effect on interstate commerce, however, is clearly plead in the complaint. *See* Complaint at ¶ 19, 20, 21, 23, 24. (Timken Mercy has annual operating revenues in excess of sixty million dollars, six million of which is derived from the sales of pharmaceutical products. Substantial portions of these revenues are alleged to be paid by patients and third party payors from outside Ohio including private health insurance plans and federal funds under the Medicare and Medicaid programs.).

■ Timken Mercy contends, however, that summary judgment is nevertheless appropriate in this case because the focus of the plaintiffs' cause of action is the wholly local sales of medications to persons who could not afford them without the assistance of the VNS, United Way agency, and thus it does not meet the interstate commerce requirement for jurisdiction. There is no evidence submitted as to this point from either party, however, and material issues of fact remain in this court's view as to whether the challenged sales were "in commerce" or "affect commerce." *See Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 743–45, 96 S.Ct. 1848, 1851–52, 48 L.Ed.2d 338 (1976); *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 194–95, 95 S.Ct. 392, 398–99, 42 L.Ed.2d 378 (1974) (The court compared the "in commerce" language of the Clayton and Robinson-Patman Act provisions with the more expansive jurisdictional reach of section 1 of the Sherman Act.); *J.P. Mascaro & Sons, Inc. v. Wm. J. O'Hara, Inc.*, 565 F.2d 264, 266–68 (3d Cir.1977).

In support of the other prong of its motion, Timken Mercy has submitted plaintiff's interrogatory answers which it claims establishes that even if there is an effect on interstate commerce, it was not substantial and therefore does not meet the requirements of a section 1 claim. The controlling consideration in this inquiry is "whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimus*, is foreclosed to ·competitors by the tie." *Fortner Enterprises v. U.S. Steel Corporation*, 394 U.S. 495, 501, 89 S.Ct. 1252, 1257, 22 L.Ed.2d 495 (1969). *See also Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. at 16, 104 S.Ct. at 1560 (There must be a substantial potential for impact on competition to justify a *per se* violation).

Timken Mercy asked each plaintiff their total dollar amount of pharmaceutical sales in the years 1981, 1982, 1983 and 1984 as well as their total amount of sales during those years to persons reimbursed by VNS. Motion Exhibits A–E. In 1984, the year Timken Mercy's contracts became effective, their sales to VNS were zero. In compiling the answers, Timken Mercy argues that the sales of any plaintiff during the years 1981–1983 to VNS were less than one percent of that plaintiff's total sales, an amount termed "minuscule." In response, plaintiffs submit that it is not the volume of their sales in prior years that is relevant but the volume of sales foreclosed by the tying arrangement, an amount incapable of precise calculation at this time. Consideration of documents and exhibits attached to plaintiff's brief results in the conclusion that a material issue of fact remains on the substantiality issue as well.

Accordingly, Timken Mercy's motion for partial summary judgment is denied.

In summary, it is the order of the court that:

1. Abbott's Motion for Summary Judgment is denied;

2. McKesson's Motion for Summary Judgment is denied;

3. Timken Mercy's Motion for Partial Summary Judgment is denied.

IT IS SO ORDERED.